Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
Priscilla D. Kam, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO               Docket No.: _____(        )
CASUALTY COMPANY,

                                            Plaintiffs

                        - against -

MACCABI PHARMACY RX INC., YURIY DAVIDOV
and JOHN DOE DEFENDANTS 1-5,

                                            Defendants.
-------------------------------------------------------------------X

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants Maccabi Pharmacy RX Inc., Yuriy

Davidov, and John Doe Numbers "1" through "5" (collectively, "Defendants"), hereby allege as

follows:

1.      This action seeks to terminate a fraudulent scheme perpetrated by the Defendants

who have exploited the New York "No-Fault" insurance system by submitting, or causing to be

submitted, thousands of fraudulent charges to GEICO for medically unnecessary "pain relieving" topical prescription drug products along with other excessive and often duplicative pharmaceutical products (collectively, the "Fraudulent Pharmaceuticals") that Maccabi Pharmacy RX Inc. ("Maccabi Pharmacy") purportedly dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").

2.      Defendants Maccabi Pharmacy and its owner, Yuriy Davidov ("Davidov"), intentionally targeted a set of select topical pain products, including lidocaine 5% ointment, lidocaine 5% patches, and diclofenac 3% gel (collectively, the "Fraudulent Topical Pain Products") in order to submit fraudulently inflated charges to GEICO.  The Defendants targeted the Fraudulent Topical Pain Products and dispensed them in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and bill for them through Maccabi Pharmacy at exorbitant prices pursuant to predetermined protocols.

3.      As an essential part of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers"), and persons ("Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that almost exclusively treated No-Fault patients ("No-Fault Clinics"), and steered them to prescribe and direct large volumes of prescriptions to Maccabi Pharmacy for the Fraudulent Pharmaceuticals in exchange for kickbacks and without regard for genuine patient care.

4.      The scheme spearheaded by the Defendants to steer the Prescribing Providers and the Clinic Controllers to routinely prescribe and direct prescriptions to Maccabi Pharmacy for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Maccabi Pharmacy and Davidov billed as

much as $1,904.75 for a single tube of lidocaine 5% ointment, $1,474.98 for a single supply of ten lidocaine 5% patches, and between $1,179.30 to $3,538.50 for a single tube of diclofenac 3% gel, while also billing for other duplicative and unnecessary Fraudulent Pharmaceuticals.  The Defendants did this knowing that there were a wide range of similar or more effective medications available at a fraction of the cost, including over the counter medications, which could have been dispensed to the Insureds.

5.      Maccabi Pharmacy is no stranger to the use of topical pain products to commit large scale insurance fraud. In fact, in a recently unsealed federal indictment, the United States Attorney for the Eastern District of New York identified Maccabi Pharmacy as part of a scheme to defraud federal health insurance programs by falsely purporting to purchase and dispense Targretin 1% gel, a topical drug used for lesions associated with lymphoma with a $34,000.00 average wholesale price  See United States of America v. Khaim, et al., 1:20-cr-00580(AMD)(RML) (E.D.N.Y. 2020).

6.      By this action, GEICO seeks to recover more than $82,200.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Maccabi Pharmacy of over $670,800.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Maccabi Pharmacy because:

      (i)     Maccabi Pharmacy billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

      (ii)    The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy in exchange for unlawful kickbacks and other financial incentives; and

(iii)     the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused Maccabi Pharmacy to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

7.     The Defendants fall into the following categories:

(i)     Maccabi Pharmacy is a New York corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals to patients and then submitted bills to GEICO and other New York automobile insurers for reimbursement to which it is not entitled;

(ii)    Davidov is the purported owner of Maccabi Pharmacy;

(iii)   John Doe Defendants "1" through "5" are persons and entities, presently not identifiable, who are not and never have been licensed healthcare professionals but who, along with Davidov, participated in the operation and control of Maccabi Pharmacy and facilitated the illegal, collusive relationships with the Prescribing Providers and the Clinic Controllers.

8.     The Defendants' scheme began in 2019 and has continued uninterrupted to the present day.  As discussed more fully below, the Defendants at all times have known that: (i) Maccabi Pharmacy billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy in exchange for unlawful kickbacks and other financial incentives; and (iii) the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and had Maccabi Pharmacy

dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

9.     Based on the foregoing, Maccabi Pharmacy does not now have – and has never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.   The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $82,200.00.

## THE PARTIES

**I.     Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland.   GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.     Defendants**

11.     Defendant Maccabi Pharmacy is a New York corporation, incorporated on or about December 6, 2018, with its principal place of business at 76-18 Jamaica Avenue, Jamaica, New York.

12.     Maccabi Pharmacy became registered as a pharmacy with the New York State Education Department Office of the Professions on March 19, 2019.

13.     Maccabi Pharmacy was active for less than one year before it transferred its registration to a successor entity on March 11, 2020.

14.    Defendant Davidov resides in and is a citizen of New York.  Davidov is the owner of Maccabi Pharmacy.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.    An Overview of New York's No-Fault Laws

17.    GEICO underwrites automobile insurance in the State of New York.

18.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

19.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

20.     The No-Fault Laws limits reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without prescription are not covered expenses under the No-Fault Laws.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

23.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

24.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law.

25.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    An Overview of Applicable Licensing Laws

26.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

27.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

28.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based patient comorbidities, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

29.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies are prohibited from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other

consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

30.     Pursuant to 8 N.Y.C.R.R. § 63.1(7)(ii), when a prescription is delivered to the patient off the premises of a pharmacy through mail delivery, a delivery service or otherwise, the pharmacy shall, among other things, include with each prescription a written offer to counsel the patient or person authorized to act on behalf of the patient who presents the prescription.

31.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

32.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

37.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

38.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

**III.     The Defendants' Scheme Involving Fraudulent Pain Products**

33.     Beginning in 2019, the Defendants, including Maccabi Pharmacy, Davidov, and John Doe Defendants "1" through "5", masterminded and implemented a fraudulent scheme in which they used Maccabi Pharmacy to bill the New York automobile insurance industry for

hundreds of thousands of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

34.     As part of the fraudulent scheme, Maccabi Pharmacy purported to be a small, neighborhood pharmacy owned of record by Davidov.

35.     Davidov had no record of owning any other pharmacy prior to becoming the sole owner and operator of Maccabi Pharmacy.

36.     Maccabi Pharmacy first became registered to operate as a pharmacy in New York State on March 19, 2019.

37.     Once it began operating, Maccabi Pharmacy did not engage in any legitimate advertising to the public, maintained no website, and did virtually nothing that would be expected of a legitimate pharmacy to develop its reputation, attract customers, and draw legitimate business.

38.     Despite the fact Maccabi Pharmacy was a new pharmacy and it had no reputation or track record in the pharmaceutical industry, Maccabi Pharmacy received large volumes of medically unnecessary prescriptions almost immediately after it became registered to operate as pharmacy.

39.     In fact, within the first 60 days of opening operations and receiving its registration to operate as a pharmacy, Maccabi Pharmacy billed GEICO alone more than $188,000.00, primarily for dispensing lidocaine 5% ointment and lidocaine 5% patches to more than 75 GEICO Insureds in that short time period, with the lidocaine ointment generally billed at $1,523.72 for each prescription.

40.     Despite purporting to be a neighborhood pharmacy catering to the needs of the local population, prescriptions for the Fraudulent Topical Pain Products (i.e., lidocaine 5% ointment,

lidocaine 5% patches, and diclofenac 3% gel) constituted more than 85% of the billing Maccabi Pharmacy submitted to GEICO.

41.     The Defendants knew that there was no legitimate reason that Maccabi Pharmacy immediately received voluminous prescriptions for numerous Insureds; knew that there was no legitimate medical need for the exorbitantly priced Fraudulent Topical Pain Products to be dispensed to the Insureds; and knew that there existed a wide range of inexpensive, over-the-counter products of similar efficacy that could have been dispensed to Insureds.

42.     The Defendants quickly obtained voluminous prescriptions for numerous Insureds because the Defendants steered the Prescribing Providers and the Clinic Controllers associated with the No-Fault Clinics to prescribe large volumes of prescriptions to Maccabi Pharmacy for the targeted set of Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals, pursuant to predetermined protocols, and in exchange for kickbacks and other compensation.

43.     As part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Prescribing Providers – operating from No-Fault Clinics that treated thousands of Insureds – purported to prescribe the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, while intentionally ignoring a vast array of prescription and over-the-counter medications readily available at a fraction of the cost.

44.     As a further part of the collusive relationships among the Defendants, the Prescribing Providers, and the Clinic Controllers, the Clinic Controllers then directed the prescriptions for the medically unnecessary and illusory Fraudulent Pharmaceuticals to Maccabi Pharmacy, so it could bill GEICO for huge sums as part of a scheme to exploit the Insureds for financial gain, without regard to genuine patient care.

45.     The No-Fault Clinics from where the prescriptions steered to Maccabi Pharmacy were generated included clinics that housed a "revolving door" of numerous other purported healthcare providers geared towards exploiting New York's No-Fault insurance system.   For example, GEICO has received billing from more than sixty (60) different healthcare providers for healthcare goods and services rendered at a No-Fault Clinic located at 105-10 Flatlands Avenue, Brooklyn, New York and which was a primary source of prescriptions that Maccabi Pharmacy submitted to GEICO in support of its charges.

46.     In keeping with the fact that Defendants established Maccabi Pharmacy to exploit the Insureds' No-Fault Benefits, without regard to genuine needs of the Insureds, Maccabi Pharmacy made no effort to promptly deliver the Fraudulent Pharmaceuticals to Insureds and instead often purported to deliver them more than two weeks after the medications were prescribed, to the extent they were even delivered at all.

47.     In short, the Fraudulent Pharmaceuticals dispensed by Maccabi Pharmacy and prescribed by the Prescribing Providers and their associates working in collusion with Maccabi Pharmacy, served no purpose other than to exploit the Insureds' No-Fault Benefits to financially benefit the Defendants.

48.     The Defendants established Maccabi Pharmacy and chose to target the Fraudulent Topical Pain Products because similar over-the-counter drugs that could be dispensed to Insureds were not covered expenses under the No-Fault Laws. However, the Defendants could acquire the Fraudulent Topical Pain Products at low cost and submit large volumes of claims for reimbursement at exorbitant prices by steering medically unnecessary prescriptions to Maccabi Pharmacy.

49.     Maccabi Pharmacy submitted its voluminous billing to GEICO for the Fraudulent Pharmaceuticals in less than one year, and despite collecting hundreds of thousands  of dollars from GEICO (and likely millions of dollars from all New York automobile insurers) over a period of months, suddenly closed down its operations and transferred its pharmacy registration.

50.     Despite suddenly ceasing the submission of large volumes of billing to GEICO, Maccabi Pharmacy remains as an active corporation and Defendants continue their fraudulent scheme by hiring law firms to pursue collection of the unpaid fraudulent charges submitted to GEICO through numerous separate No-Fault arbitration or civil court collection proceedings. In fact, there are currently over 200 pending collection proceedings seeking to collect unpaid claims that the Defendants submitted to GEICO through Maccabi Pharmacy.

51.     The Defendants' continued collection efforts through separate No-Fault arbitration or civil court collection proceedings is an essential part of their fraudulent scheme since they know it is impractical for a No-Fault arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving the prescription, steering, and dispensing of fraudulent pharmaceutical products to hundreds of patients across numerous different clinics located throughout the metropolitan area.

**A**.     **The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care in Order to Exploit Patients for Financial Gain**

52.     In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Maccabi Pharmacy – were virtually always subjected to a predetermined and unnecessarily

prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

53.     Despite this basic goal, the treatment reports for the Insureds who received pharmaceuticals from Maccabi Pharmacy almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

54.     Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render to Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

55.     Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions of the Fraudulent Pharmaceuticals dispensed by Maccabi Pharmacy were based on predetermined protocols designed to exploit Insureds' for financial gain, and without regard to the genuine needs of the patients.

56.     To the extent any examination was performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

57.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

58.     The Prescribing Providers also routinely failed to document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

59.     The Prescribing Providers also routinely failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Maccabi Pharmacy were actually used by the patient.

**B.      The Fraudulent Lidocaine Ointment and Lidocaine Patches**

60.     The Prescribing Providers prescribed, and Maccabi Pharmacy purported to dispense, medically unnecessary topical lidocaine 5% ointment and lidocaine 5% patches (the "Topical Lidocaine Products"), billing GEICO as much as $1,904.75 for a single tube of lidocaine ointment and $1,474.98 for a single supply of ten lidocaine patches.

61.     The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary, duplicitous prescriptions for the Topical Lidocaine Products from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

62.     The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Topical Lidocaine Products because the Defendants could readily buy these products at low cost but submit claims for reimbursement through Maccabi Pharmacy to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

63.     In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, the Topical Lidocaine Products were prescribed, dispensed, and

billed for despite the fact that they were medically unnecessary and that there are other, less expensive, lidocaine products which are approved by the United States Food and Drug Administration ("FDA") and available over-the-counter.

64.    In further keeping with the fact that these Fraudulent Topical Pain Products were prescribed pursuant to predetermined treatment and billing protocols designed to maximize profits without regard to patient care, nearly 80% of all GEICO Insureds who had a prescription filled by Maccabi Pharmacy received at least one—usually more—prescription Topical Lidocaine Product.

65.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Topical lidocaine is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

66.    Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

67.    Topical pain patches in which the primary ingredient is lidocaine are  FDA approved only to treat chronic post-herpetic neuropathic pain (i.e., continued nerve pain after a patient recovers from shingles), although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.  In fact, while application of pain patches in which the primary ingredient is lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

68.    Excessive dosage or short intervals between doses of topical lidocaine can cause adverse effects.  Patients should be instructed to strictly adhere to the recommended dosage and a single application of topical lidocaine should not exceed 5 grams.

69. Maccabi Pharmacy nevertheless repeatedly billed GEICO for dispensing Topical Lidocaine Products containing 5% lidocaine to numerous GEICO's Insureds.

70. Notably, lidocaine ointments and patches with 4% lidocaine are available over-the-counter and have a similar efficacy of lidocaine 5% at a fraction of the cost.

71. Yet, the Prescribing Providers never recommended Insureds first try commonly available commercial lidocaine products to treat their patients' minor aches and pains which they sustained in fender-bender type motor vehicle accidents.

72. In comparison to the exorbitant charges submitted by Maccabi Pharmacy to GEICO for the Topical Lidocaine Products, over-the-counter products such as Icy Hot Lidocaine or Aspercreme with lidocaine, both of which contain 4% lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10 or less.

73. The Topical Lidocaine Products dispended by Maccabi Pharmacy were prescribed pursuant to predetermined protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as OTC medications, proven to have therapeutic effects and available at a fraction of the cost.

74. In keeping with the fact that the Topical Lidocaine Products were prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, neither the prescriptions allegedly issued by the Prescribing Providers, nor the labels affixed to the prescriptions by the Pharmacy Defendants set forth sufficient instructions for the use of the lidocaine 5% ointment dispensed.

75. In further keeping with the fact that the Topical Lidocaine Products were being prescribed and dispensed pursuant to predetermined protocols and without regard for patient care and safety, the Prescribing Providers and Maccabi Pharmacy engaged in therapeutic duplication

in that they regularly prescribed and dispensed to patients multiple Topical Lidocaine Products contemporaneously.  In addition to engaging in this therapeutic duplication, the Prescribing Providers and Maccabi Pharmacy often prescribed and dispensed additional pharmaceuticals, including oral nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers contemporaneous to the Topical Lidocaine Products.

76.     Further, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the contemporaneous prescription of multiple pharmaceuticals or provided any explanation for the therapeutic duplication resulting from the contemporaneous prescribing and dispensing of multiple Topical Lidocaine Products.

77.     For example:

(i)     On August 26, 2019, an Insured named KH was involved in an automobile accident.  On September 13, 2019, Maria Rivera-Iturbe-Iturbe, M.D. ("River-Iturbe") examined KH for the first time and purportedly prescribed KH 200 grams of lidocaine 5% ointment and 30 lidocaine patches in addition to cyclobenzaprine and naproxen.  River-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(ii)    On August 26, 2019, an Insured named NH was involved in an automobile accident.  On September 12, 2019, NH saw Rivera-Iturbe for an initial exam.  Several days later, on September 16, 2019, Rivera-Iturbe purportedly prescribed the Insured 200 grams of lidocaine 5% ointment and 30 lidocaine patches in addition to methocarbamol and naproxen.  Rivera-Iturbe did not

state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(iii)    On August 14, 2019, an Insured named MW was involved in an automobile accident.  On August 21, 2019 MW saw Rivera-Iturbe for an initial exam.  Several days later, on August 27, 2019, Rivera-Iturbe purportedly prescribed the Insured 200 grams of lidocaine 5% ointment and 30 lidocaine patches in addition to ibuprofen.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.  Notably, MW has a complicated medical history which includes, among others, cancer, HIV, and hypertension. High blood pressure increases a patient's risks of cardiac events when taking NSAIDs. At the time of the initial examination, MW's blood pressure was 134/92 and nevertheless, Rivera-Iturbe prescribed MW an oral NSAID (i.e., ibuprofen).

(iv)    On September 17, 2019, an Insured named WW was involved in an automobile accident.  On September 26, 2019, WW saw Rivera-Iturbe for an initial exam.  Several days later, on October 7, 2019, Rivera-Iturbe purportedly prescribed the Insured 200 grams of lidocaine 5% ointment and 60 lidocaine patches, in addition to cyclobenzaprine and ibuprofen.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(v)    On April 20, 2019, an Insured named AV was involved in an automobile accident.  On May 1, 2019, AV saw Patricia Kelly, D.O. ("Kelly") for an initial exam and was purportedly prescribed 200 grams of lidocaine 5%

ointment, in addition to naproxen and cyclobenzaprine. Kelly did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(vi)     On May 8, 2019, an Insured named JM was involved in an automobile accident. On May 20, 2019, JM saw Kelly for an initial exam and was purportedly prescribed 200 grams of lidocaine 5% ointment, in addition to naproxen and cyclobenzaprine. Kelly did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(vii)    On May 8, 2019, an Insured named KM was involved in an automobile accident. On May 20, 2019, KM saw Kelly for an initial exam and was purportedly prescribed 200 grams of lidocaine 5% ointment, in addition to naproxen and cyclobenzaprine. Kelly did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(viii)   On April 24, 2019, an Insured named SD was involved in an automobile accident. On May 7, 2019, SD saw Pauline Raitses, D.O. ("Raitses") for an initial exam and was purportedly prescribed 200 grams of lidocaine 5% ointment, in addition to naproxen. Raitses did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(ix)     On August 23, 2019, an Insured named IF was involved in an automobile accident. On September 12, 2019, IF saw Raitses for an initial exam and was purportedly prescribed 200 grams of lidocaine 5% ointment, in addition

to naproxen.  Raitses did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

(x)   On August 9, 2019, an Insured named JF was involved in an automobile accident.  On August 15, 2019, JF saw Raitses for an initial exam and was purportedly prescribed 200 grams of lidocaine 5% ointment, in addition to naproxen.  Raitses did not state the medical basis for the excessive prescriptions or advise the insured to try OTC lidocaine products.

78.   In further keeping with the fact that the lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, any follow-up examination reports prepared by the Prescribing Providers virtually never addressed whether the lidocaine was effective or not, to what degree, or whether the patient experienced any side effects.

79.   For example:

(i)   Insured KH saw Rivera-Iturbe again on October 25, 2019.  Rivera-Iturbe did not address that KH had previously been prescribed multiple lidocaine medications, whether the lidocaine was effective or not, or whether KH experienced any side effects.

(ii)   Insured NH saw Rivera-Iturbe again on October 17, 2019.  Rivera-Iturbe did not address that NH had previously been prescribed multiple lidocaine medications, whether the lidocaine was effective or not, or whether NH experienced any side effects.   Nevertheless, Rivera-Iturbe prescribed lidocaine 5% ointment again on this date.

(iii)   Insured MW saw Maria Rivera-Iturbe again on September 23, 2019.  Rivera-Iturbe did not address that MW had previously been prescribed

multiple lidocaine medications, whether the lidocaine was effective or not, or whether MW experienced any side effects. Nevertheless, Rivera-Iturbe prescribed lidocaine patches again on this date.

(iv)    Insured AV saw Kelly again on June 10, 2019.  Kelly did not address that AV had previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether AW experienced any side effects.

(v)    Insured JM saw Kelly again on June 19, 2019.  Kelly did not address that JM had been previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether JM experienced any side effects.

(vi)    Insured KM saw Kelly again on June 19, 2019.  Kelly did not address that KM had previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether KM experienced any side effects.

(vii)    Insured SD saw Raitses again on June 6, 2019. Raitses did not address that SD had previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether SD experienced any side effects. Nevertheless, Raitses prescribed lidocaine ointment again on this date.

(viii)    Insured IF saw Raitses again on October 29, 2019.  Raitses did not address that IF had previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether IF experienced any side effects. Nevertheless, Raitses prescribed lidocaine ointment again on this date.

(ix)    Insured JF saw Raitses again on September 12, 2019.  Raitses did not address that JF had previously been prescribed lidocaine ointment, whether the lidocaine was effective or not, or whether JF experienced any side

effects.  Nevertheless, Raitses prescribed lidocaine ointment again on this date.

80.    There is no legitimate medical reason for the Prescribing Providers to prescribe large volumes of Topical Lidocaine Products to Insureds, particularly given the availability of OTC medications.

81.    There is no legitimate medical reason why Maccabi Pharmacy repeatedly dispensed the Topical Lidocaine Products to Insureds, particularly given the legal requirements placed on pharmacists to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications based on patient comorbidities, therapeutic duplication, drug-drug interactions, duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

82.    The Defendants' egregious billing in predetermined patterns, coupled with the fact that the Prescribing Providers routinely failed to properly document the Insureds' use of these medications, further indicates that there is no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications, and for Maccabi Pharmacy to have dispensed these medications, to the Insureds, particularly given the potential for adverse health effects.

### C.    The Fraudulent Diclofenac Prescriptions

83.    In accordance with the fraudulent scheme discussed above, Maccabi Pharmacy routinely billed GEICO for the exorbitantly priced topical NSAID diclofenac sodium, almost exclusively in the form of diclofenac 3% gel ("Topical Diclofenac"), pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers.

84.     Maccabi Pharmacy routinely billed GEICO between $1,179.30 to $3,538.50 for a single tube of Topical Diclofenac dispensed to a single Insured.

85.     The Defendants, in exchange for the payment of kickbacks or other incentives, received medically unnecessary, duplicitous prescriptions for Topical Diclofenac from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols

86.     The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but submit claims for reimbursement through Maccabi Pharmacy to GEICO and other New York No-Fault insurers for huge sums based on egregiously high wholesale list prices.

87.     In keeping with the fact that these Fraudulent Topical Pain Products were prescribed and dispensed pursuant to predetermined protocols designed to maximize profits without regard to patient care, the Topical Diclofenac products were prescribed, dispensed, and billed for despite the fact that they were medically unnecessary and that there are other, less expensive, over-the-counter, FDA-approved topical pain products available.

88.     The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

89.     A "Black Box Warning" is the strictest FDA warning attached to the labeling of a prescription drug or product and is designed to call attention to serious or life-threatening risks associated with the drug or product.

90.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular

thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

91.     While formulations containing 1% diclofenac are typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet, they have not been proven effective for treating strains or sprains.

92.     Moreover, the Topical Diclofenac (diclofenac 3% gel) that the Prescribing Providers primarily prescribed, and the Defendants dispensed and billed for, is only indicated for the treatment of actinic (or solar) keratosis – a skin condition caused by years of excessive sun exposure.

93.     Topical Diclofenac has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted off-label use.

94.     Notwithstanding the most common and accepted uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed NSAIDs – such as ibuprofen, or naproxen – and other Fraudulent Pharmaceuticals.

95.     Prescribing Topical Diclofenac while simultaneously prescribing or recommending the patient take oral NSAIDs is therapeutic duplication, which may result in increased risk of adverse events with no additional therapeutic benefit.

96.     Nevertheless, the Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with other oral NSAIDs and/or other

Fraudulent Topical Pain Products to numerous Insureds regardless of the nature of each Insured's injuries and the risks it posed to the Insureds' health and well-being.

97.    For example:

(i)    On March 24, 2019, an Insured named DR was involved in an automobile accident.  On July 18, 2019, DR saw Rivera-Iturbe for a follow up medical examination.   Several days later, on July 22, 2019, Rivera-Iturbe purportedly prescribed DR 200 grams of diclofenac 3% gel, as well as lidocaine patches, ibuprofen, and cyclobenzaprine, with no mention of the potential health risks of taking the diclofenac and ibuprofen together. Notably, as stated above, NSAIDs are subject to a "Black Box Warning" meant to call attention to serious or life-threatening risks associated with the drug. When a patient has high blood pressure, it increases that patient's risks of the cardiac events associated with the use of NSAIDs.  At the time of the follow up examination on July 18, 2019, DR's blood pressure was 157/96. Nevertheless, Rivera-Iturbe prescribed DR both a topical NSAID <u>and</u> an oral NSAID (i.e., diclofenac 3% gel and ibuprofen) thereby engaging in therapeutic duplication and putting the patient at increased risk of a cardiac event.

(ii)    On May 23, 2019, an Insured named KM was involved in an automobile accident.  On September 3, 2019, KM saw Rivera-Iturbe for a follow up medical examination at which time Rivera-Iturbe purportedly prescribed KM 100 grams of diclofenac 3% gel, as well as lidocaine patches, naproxen,

and cyclobenzaprine, with no mention of the potential health risks of taking the medications together.

(iii)     On May 18, 2019, an Insured named CB was involved in an automobile accident. On July 19, 2019, CB saw Rivera-Iturbe for a follow up examination.  Notably, at the time of the examination, CB was <u>15 years old</u> and taking medication to treat bipolar disorder and asthma. Several days following the examination, on July 24, 2019, Rivera-Iturbe purportedly prescribed CB 200 grams of diclofenac 3% gel, as well as lidocaine patches and ibuprofen, with no mention of the potential health risks of taking the medications together or with taking them in conjunction with CB's bipolar and asthma medications.    Furthermore, diclofenac 3% gel should not be used by children, and the safety and efficacy of lidocaine has not been established in pediatric patients.

(iv)     On March 14, 2019, an Insured named JF was involved in an automobile accident.   On July 11, 2019, JF saw Kelly for a follow up medical examination.  Kelly purportedly prescribed JF 200 grams of diclofenac 3% gel as well as naproxen, with no mention of the potential health risks of taking the two medications together.

98.     The Topical Diclofenac was prescribed pursuant to predetermined treatment protocols and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as OTC medications, proven to have therapeutic effects and available at a fraction of the cost.

99.     In keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the examination reports prepared by the prescribing physicians virtually never stated the medical basis for the prescriptions.

100.    For example:

(i)     On April 14, 2019, an Insured named DHE was involved in an automobile accident.   On July 19, 2019, DHE saw Rivera-Iturbe for a follow up examination and was prescribed 200 grams of diclofenac 3% gel, in addition to gabapentin and nabumetone.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC pain products.

(ii)    On May 23, 2019, an Insured named JP was involved in an automobile accident.   On August 8, 2019, JP saw Rivera-Iturbe for a follow up examination.  On August 13, 2019, Rivera-Iturbe prescribed JP 200 grams of diclofenac 3% gel, in addition to lidocaine patches, gabapentin, and methocarbamol.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC pain products.

(iii)   On April 3, 2019, an Insured named TJ was involved in an automobile accident.   On May 23, 2019, TJ saw Rivera-Iturbe for a follow up examination.  On May 28, 2019, Rivera-Iturbe prescribed TJ 200 grams of diclofenac 3% gel, in addition to cyclobenzaprine and meloxicam.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC pain products.  Notably, as stated above,

NSAIDs are subject to a "Black Box Warning" meant to call attention to serious or life-threatening risks associated with the drug. When a patient has high blood pressure, it increases that patient's risks of the cardiac events associated with the use of NSAIDs. At the time of the follow up examination on May 28, 2019, TJ's blood pressure was 151/94. Nevertheless, Rivera-Iturbe prescribed TJ a topical NSAID <u>and</u> an oral NSAID (i.e., diclofenac gel 3% and meloxicam) thereby engaging in therapeutic duplication and putting the patient at increased risk of a cardiac event.

(iv)     On May 22, 2019, an Insured named FA was involved in an automobile accident.  On August 5, 2019, FA saw Rivera-Iturbe for a follow up examination, and Rivera-Iturbe prescribed FA 200 grams of diclofenac 3% gel, in addition to 200 grams of lidocaine 5% ointment, gabapentin, and nabumetone.  Rivera-Iturbe did not state the medical basis for the excessive prescriptions or advise the insured to try OTC pain products.  Notably, Rivera-Iturbe also failed to document the fact that FA received multiple prescription medications in a short period of time in addition to those Fraudulent Pharmaceuticals dispensed pursuant to Rivera-Iturbe's prescription of August 5, 2019.  For example, on June 3, 2019, FA received prescriptions for lidocaine 5% ointment, cyclobenzaprine and 500 mg of Tylenol; on June 10, 2019, FA received prescriptions for lidocaine 5% ointment, cyclobenzaprine, and acetaminophen; and on July 9, 2019, FA received prescriptions for lidocaine 5% ointment, cyclobenzaprine, and

naproxen. These prescriptions were filled, and the pharmaceuticals ultimately dispensed to FA on or about the date of the prescriptions.

101. Maccabi Pharmacy billed GEICO hundreds of thousands of dollars for Topical Diclofenac despite its lack of proven efficacy or safety in the treatment of musculoskeletal injuries, and caused the Prescribing Providers and Clinic Controllers to steer prescriptions to them solely to maximize its profits.

102. Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services recently issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium because, among other reasons, there is a striking difference between the cost of a compounded topical containing diclofenac sodium and a non-compounded version of the same drug. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018).

**D. The Illegal, Collusive Arrangements Between Maccabi Pharmacy and the Prescribing Providers and Clinic Controllers**

103. To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Maccabi Pharmacy for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, and in exchange for kickbacks, which egregiously inflated the charges submitted to GEICO.

104. New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii)

"directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

105.   Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, many of which treat thousands of Insureds, to have the Prescribing Providers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then direct those prescriptions to Maccabi Pharmacy so that the Defendants could bill GEICO egregious sums.

106.   In furtherance of the scheme, the Prescribing Providers and Clinic Controllers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics and to route those prescriptions to Maccabi Pharmacy pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

107.   The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals despite their knowledge that: (i) the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; (iii) the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

108.    Here, the Defendants arranged with various No-Fault Clinics that treat thousands of Insureds to have the licensed physicians and/or their associates operating therefrom, including the Prescribing Providers, prescribe, or purport to prescribe, the medically unnecessary and illusory Fraudulent Pharmaceuticals to the Insureds, which in turn permitted the Defendants to bill GEICO huge sums under the name of Maccabi Pharmacy.

109.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, despite their knowledge that the Fraudulent Pharmaceuticals were medically unnecessary and were being prescribed without regard to pharmacologic outcomes or cost and attention to fiscal responsibility.

110.    The Prescribing Providers and Clinic Controllers issued and directed the many prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy because the prescriptions were only being issued pursuant to the illegal, collusive arrangements among the Defendants and the Prescribing Providers and Clinic Controllers.

111.    The Prescribing Providers and Clinic Controllers never gave the Insureds the option to use a pharmacy of their choosing, rather the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located far from Maccabi Pharmacy and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

112.    Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

113. In fact, less than 5% of Insureds who received prescriptions from Maccabi Pharmacy reside in Jamaica – the Queens County neighborhood where Maccabi Pharmacy is located – while less than 26% of Insureds resided anywhere in Queens County.

114. Upon information and belief, Maccabi Pharmacy purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, without the patient ever having the choice of which pharmacy to use and, in many cases, without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

115. The Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Maccabi Pharmacy, and to ensure that the Defendants benefitted financially from the prescriptions.

116. The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

117. The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

118. The Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives such as employment at a No-Fault Clinic.

119. But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain

Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Maccabi Pharmacy.

120.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

121.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentive, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Maccabi Pharmacy.

122.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**E.      The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

123.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

124.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

125.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge

no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

126.   For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

127.   The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Pharmaceuticals because the Defendants could readily buy the Fraudulent Pharmaceuticals at low cost, but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

128.   The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive wholesale prices in order to inflate the billing submitted through Maccabi Pharmacy so as to maximize their profits.

129.   In support of their charges, the Defendants typically submitted an NF-3 form which included the purported NDC numbers and corresponding charges for each drug product dispensed.

130.   The NDC numbers listed on the NF-3 Form submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

131.   The Defendants never submitted their actual wholesale purchase invoices demonstrating (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals, and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

132.   In fact, the Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to

dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products.

133.     Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved, proven effective medications or commercially available over-the-counter-products.

## IV.     The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

134.     To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Maccabi Pharmacy seeking payment for the pharmaceuticals for which it is ineligible to received payment.

135.     These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

     i.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

     ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to Maccabi Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; and

     iii.     The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants are in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Defendants did not comply with all material licensing

requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## V.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

136.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

137.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

138.   Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the Defendants (i) have been involved in collusive, kickback arrangements to generate voluminous prescriptions pursuant to a fraudulent predetermined treatment and billing protocol, without regard to genuine patient care; and (ii) prescribed and dispensed pharmaceuticals that have no efficacious value and grossly exceed the cost of other effective FDA-approved medications.

139.   The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

140.   The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Maccabi Pharmacy continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Maccabi Pharmacy has been engaged in fraud.

141.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents that were submitted to GEICO in support of

the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $82,200.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

142.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

143.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

144.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $670,800.00 in fraudulent billing for the Fraudulent Pharmaceuticals that Maccabi Pharmacy has submitted to GEICO.

145.    Maccabi Pharmacy has no right to receive payment for any pending bills submitted to GEICO because it billed for Fraudulent Pharmaceuticals that were medically unnecessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

146.    Maccabi Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Maccabi Pharmacy in exchange for unlawful kickbacks and other financial incentives.

147.    Maccabi Pharmacy has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products, including the Fraudulent Topical Pain Products, that they acquired at low cost, and caused Maccabi Pharmacy to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to fraudulently inflate the charges to GEICO.

148.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Maccabi Pharmacy has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against All Defendants**
**(Common Law Fraud)**

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

150.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals.

151.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Pharmacy Fee Schedule, when in fact the Fraudulent Pharmaceuticals were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care; (ii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault

Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous prescriptions to Maccabi Pharmacy for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives; and (iii) in every claim, the representation that the Defendants were in compliance with all material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

152.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Maccabi Pharmacy that were not compensable under the No-Fault Laws.

153.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $82,200.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Maccabi Pharmacy.

154.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

155.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

156.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

157.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

158.    When GEICO paid the bills and charges submitted by or on behalf of Maccabi Pharmacy for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

159.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

160.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

161.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $82,200.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim For Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Maccabi Pharmacy has no right to

receive payment for any pending bills, amounting to approximately $670,800.00 submitted to GEICO;

B.     On the Second Claim For Relief against Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $82,200.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.     On the Third Claim For Relief against Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $82,200.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
        March 1, 2021

RIVKIN RADLER LLP


By:     /s/ Michael A. Sirignano
        Michael A. Sirignano (MS 5263)
        Barry I. Levy (BL 2190)
        Joshua D. Smith (JS 3989)
        Priscilla D. Kam (PK 15050)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*